247 P.2d 981

DUNLAP et al. v. ALBUQUERQUE NAT. BANK.

No. 5405.

Supreme Court of New Mexico.
Sept. 8, 1952.

W. T. O'Sullivan, Albuquerque, for appellants.

Simms, Modrall, Seymour & Simms, George T. Harris, Jr., Albuquerque, for appellee.

SADLER, Justice.

The appellants, the plaintiffs below, complain of a judgment rendered against them on a verdict directed by the district court of Bernalillo County in an action in which they sought recovery of damages in the sum of $1,500 claimed to have been suffered in the alleged wrongful payment of that amount to an unauthorized person out of an escrow fund on deposit in the defendant bank, contrary to the terms of the escrow agreement.

The controversy grows out of a contract between the plaintiffs and one William K. Algire for the construction for the former of a house in Albuquerque to be occupied by plaintiffs as a place of residence. The defendant bank was to finance the project to the extent of $10,500, secured by their note and mortgage of even date. The work did not move along as planned. Certain extras were desired and furnished by the contractor at an additional cost of $1,500 above the contract price. Nevertheless, by December 4, 1948, the construction had come to a halt. At this point the plaintiffs called in an architect to supervise future work and the parties entered into a new contract under date of December 4, 1948.

The new contract called for a performance bond to be given by Algire, the contractor, in the sum of $6,000, payable on default to the plaintiffs and the defendant bank, as their respective interests might appear. This bond was duly executed and delivered on the date mentioned, viz., December 4, 1948. The new contract also designated William E. Burk, an architect, as representative of the parties for the purpose

of supervising construction and settling disputes between the parties, etc. Paragraph 4 and so much of paragraph 5 of the new contract as is material read as follows:

"4. First party hereby agrees to complete the construction of said dwelling as provided by the basic contract and contract documents for the sum of Twelve Thousand, Five Hundred and No/100 Dollars ($12,500.00), exclusive of extras, and he hereby acknowledges receipt of the sum of Ten Thousand, Five Hundred and No/100 Dollars ($10,500.00). The balance of Two Thousand and No/100 Dollars ($2,000.00) to be paid under the contract, exclusive of extras, shall be at such times and in such amounts as certified by the representative of the parties based upon the progress of construction.

"5. It is understood that there have been certain deviations from the basic contract, for which the second parties are entitled to credit, and that there have been certain extras ordered by second parties, for which first party shall be entitled to payment, and that the parties have hereby agreed to settle the extras and credits due from one to the other upon the following basis: That the contractor shall, upon the completion of the contract, be entitled to receive the sum of One Thousand, Five Hundred and No/100 Dollars ($1,500.00), making the total consideration Fourteen Thousand and No/100 Dollars ($14,000.00), which said sum of One Thousand, Five Hundred and No/100 Dollars ($1,500.00) is paid in full and complete discharge of all extras to date and is so accepted by the contractor, and the owners acknowledge that in arriving at the said sum of One Thousand, Five Hundred and No/100 Dollars ($1,500.00) they have received all credits due them from the contractor by reason of changes and deletions which have been made to date from which a credit could or would accrue to them. * * *."

The new contract and bond having been duly executed, work on the construction of the house was resumed. Actually, and notwithstanding any acknowledgement by him in the new contract, Algire had only received $8,500 from the bank (defendant), the additional $2,000 necessary to make up the $10,500 expressed in the note and mortgage held by it being retained by the bank against completion of the contract. Thus it was that on the date upon which the new contract was executed, December 4, 1948, the plaintiffs, Lewis W. Dunlap and Mary B. Dunlap, his wife, prepared, signed and delivered to the defendant bank what came to be known at the trial as the "escrow letter" for the alleged violation of the terms of which this action was instituted. It reads, with the endorsement of acceptance added at the end thereof, as follows:

"Albuquerque, New Mexico

"December 4, 1948

"Mr. Oscar Love,

"Albuquerque National Trust
& Savings Bank,

"Albuquerque, New Mexico

"Dear Mr. Love:

"We hand you herewith the sum of $1,500.00, which together with the $2,000.00 additional due us under our loan upon the property on Solar Drive is to be held by you as escrow agent to be paid over to Mr. William K. Algire by you when you receive a written certificate from Mr. William E. Burk, Jr., Registered Architect, that our home is fully completed according to plans and specifications and releases of mechanic's and materialmen's liens have been furnished.

"Please express your acceptance on the bottom of this letter.

"Very truly yours,
"/s/ Lewis W. Dunlap
"Lewis W. Dunlap
"/s/ Mary B. Dunlap
"Mary B. Dunlap

"I hereby acknowledge receipt of the moneys hereinbefore specified and agree to hold same according to the terms of this letter.

"Dated this 10 day of December, 1948.

"Albuquerque National Trust & Savings Bank Albuquerque, New Mexico

"/s/ Ralph E. Becker ~~Oscar Love~~"

Subsequent to the arrangement evidenced by the new contract Algire defaulted on performance under the contract and after lengthy appraisals and negotiations with the National Surety Company, the surety on the bond, it paid over to the Dunlaps the total sum of $5,046.69 in full settlement of its liability on the bond. Thereupon, one George Rutherford, a contractor, under terms mutually agreed upon between him and the Dunlaps took over completion of the defaulted contract and having done so received therefor the proceeds of the defaulted bond in the sum last above mentioned.

Thereafter and under date of November 23, 1949, the architect named in the new contract, Wm. E. Burk, addressed the following letter to the plaintiff, Lewis W. Dunlap, to wit:

"William Emmett Burk Junior . A.I.A.
"Architect . Albuquerque
New Mexico
"1001 East Roma Avenue
"November 23, 1949

"Mr. Lewis W. Dunlap

"630 Solar Drive

"Albuquerque, New Mexico

"Dear Mr. Dunlap:

"I hereby certify that the construction of your residence is complete in

every respect so far as the contract documents are concerned, and I recommend the release of $3,500.00, held in escrow at the Albuquerque National Trust and Savings Bank, to Mr. George A. Rutherford, Contractor, only, along with the check from the National Surety Corporation in the amount of $5,046.69.

"I am certifying to this completion and approving the payment on the condition that William K. Algire sign waiver of lien against this real estate.

"Please find enclosed a complete set of lien releases as furnished by the Contractor, Mr. George A. Rutherford.

"Very truly yours,

"/s/ Wm. E. Burk, Jr.

"W. E. Burk, Jr., A.I.A.

"Architect

"WEB : ia

"Encls.

cc Mr. William K. Algire"

This letter certified to completion of the building and was addressed to Lewis W. Dunlap, one of the plaintiffs. It was delivered by Burk, the architect, personally to the defendant bank through Oscar Love, one of its vice-presidents. At the same time and contemporaneously therewith the releases of all liens and waiver of lien by William K. Algire were furnished the defendant along with the architect's certificate that the job was completed. The situation being thus and the defendant, deeming the conditions of the escrow letter had been complied with as to the architect's certificate of completion and furnishing of lien releases as well as waiver of lien by Algire, paid over to him the $1,500 so held in escrow. Thereupon, he paid over to the bank (defendant) the total amount of the escrow fund so received on note indebtedness due to the bank from him.

█ Unquestionably, this fact is the major circumstance causing the plaintiffs to feel that the bank had wrongfully diverted funds subject to their order contrary to terms of the escrow. It resulted in this action to recover the amount thereof as moneys belonging to the plaintiffs, claimed to have been embezzled by the bank and appropriated to its own uses. However, if the money actually belonged to Algire under the terms of the escrow, it was his to do with as he pleased and the mere fact that he immediately applied it on indebtedness owing to the bank in no manner detracts from his right to have done so. Thus is disclosed the decisive consideration presented by this appeal, namely, did the bank violate the terms of the escrow letter in paying over the $1,500 to Algire? The trial court ruled it did not and directed a verdict in its favor. We think its ruling was correct for reasons to follow.

Now of one thing there can be not the slightest doubt. It is that the two conditions named in the escrow letter to release of the $1,500 to Algire, viz., the architect's certificate that the building was completed and the furnishing of duly executed acquittances of all liens, had been complied with before the money was turned over to Algire. If the bank's right to rely upon fulfillment of these conditions prerequisite to its action is to be denied, it must arise on the claim of plaintiff's counsel that under terms of the new contract for completion of the building the $1,500 was to be paid "to the contractor upon completion of the contract" and that at that time Algire was no longer the "contractor" but Rutherford instead occupied that status. The trial court's reaction to this claim is disclosed by this colloquy between court and counsel following an objection by counsel for defendant to a question asked of Lewis Dunlap, one of the plaintiffs, while testifying as a witness, to wit:

"Q. Did you ever authorize the release of the $3500.00 or any part of it to Mr. Algire?

"Mr. Modrall: We object to that. There is nothing indicating that under the escrow instructions he was to authorize a release to anybody. The letter of instructions spoke for itself.

"Mr. O'Sullivan: This is in anticipation of our belief that, there will be shown when the escrow letter was delivered to the bank, the agreement of the same date was also delivered, and the agreement is what we rely upon with respect to the relief for Mr. Burk's part.

"The Court: You are suing on the escrow?

"Mr. Modrall: Yes.

"The Court: The escrow doesn't say that the architect says any money should be paid to anybody. It merely provides that he certify when the money is payable. That is, when the house has been completed and released of all liens. Then that escrow agreement says, the money shall be paid to whom; nobody but the one man named in it. It doesn't say to somebody that the architect says it shall be paid to. It says it shall be paid to Algire. If that is the escrow, and it is put up in that way, how are you going to put the architect in and say that he was told to pay it to somebody else?

"Mr. O'Sullivan: The contract will be shown to be delivered to the bank.

"The Court: The bank is a party to the escrow, but they didn't sign the contract. That is a private contract between the builder and the owner. The bank didn't sign that contract. They did accept this escrow agreement to pay $1500.00 to a buyer when an architect

644

said the building was completed and free from liens.

"What is the question?

"(Question read by Reporter.)

"Mr. Modrall: We object. The question is immaterial. Whether he did or did not, he wasn't the one to authorize.

"The Court: I think that is right. He didn't have to under the escrow. He had no power to pay it to anybody. He had to certify certain facts is all, and then it was due to whoever the escrow instrument said. The contractor couldn't be paid until the architect said the building was completed and free from liens. He had nothing to do with who was to get the $1500.00. The escrow itself said who should get it."

The only contract by which the bank was bound was the letter containing the terms of the escrow which had been accepted by it in writing endorsed on the bottom of the escrow letter. Algire was the person expressly named in that letter as the one to receive the $1,500 on fulfillment of the conditions of the escrow. Counsel for the plaintiffs appreciates this handicap to recovery by them for in his brief he states:

"The 'escrow letter' was ineptly phrased, perhaps in anticipation of the completion of the new contract by Al-gire as contractor at that time, for in designating the person to whom the 'escrow fund' would be payable, upon performance of the conditions named in the letter, it mentioned 'Mr. William K. Algire' instead of using the contract-terms, i. e., 'the contractor * * upon completion of the contract.'"

Counsel for plaintiffs argues earnestly here as undoubtedly he did below that when the contract executed on the day the escrow letter was written is read in connection with the escrow letter the name of Algire as payee of the fund is to be ignored and that of Rutherford who took over performance of the contract on Algire's default is to be substituted as payee. The trial court did not so view the matter nor do we. In the first place there is wide conflict in the testimony as to whether the bank was ever in possession of a copy of this contract, one of the plaintiffs first agreeing that only the escrow letter and check for $1,500 was delivered and later correcting his testimony to say that a copy of the contract went along with the escrow letter and check into hands of the bank, a fact disputed in the testimony of bank officials. But viewing the evidence most favorably to the plaintiffs, we must accept as a fact that the bank did have a copy.

However, the bank's contract was the escrow letter. It was not signatory to the

contract between the plaintiffs and Algire. It is worth noticing, too, that even if the contract be considered it discloses in paragraph 5 thereof that the $1,500 fund in escrow represented an agreed amount due Algire for extras already furnished in construction of the house and about which the parties had been in wide disagreement as to the amount up to date of this contract wherein the matter was settled and compromised.

There also is wide conflict in the testimony as to whether the bank was warned by plaintiffs not to make payment of the questioned fund to Algire. The plaintiffs, or one of them, first testified quite positively one day that there were no further directions or instructions, oral or written, than those expressed in the escrow letter. Then following a recess overnight the same witness took the stand next day to affirm with equal positiveness that the very day before the bank paid Algire they warned it through one of its officers not to make the payment. Of course, the official through whom this warning supposedly was given was equally certain that no such warning had been given, as demonstrated by the absence of any record of same pursuant to banking practice. According to the rule on motion for directed verdict in jury trials as well as demurrers to the evidence and motions to dismiss in non-jury trials, we must take it as a fact that this warning

was given. Sanchez v. Torres, 35 N.M. 383, 298 P. 408; Perez v. Fred Harvey, Inc., 54 N.M. 339, 224 P.2d 524.

Nevertheless, it was wholly ineffective unless the bank was bound by the contract between the plaintiffs and Algire which it never signed nor agreed to observe. We have held that contract was not a part of the escrow agreement between the bank on the one hand and the plaintiffs and Algire on the other. Furthermore, and as already shown even if the contract is to be considered it discloses in paragraph 5 thereof that the questioned fund represents an agreement of compromise on an amount admittedly due Algire for extras paid for by him out of his own pocket.

Counsel for plaintiffs place great reliance on the case of Davisson v. Citizens National Bank, 15 N.M. 680, 113 P. 598, and subsequently determined on a later appeal to the Supreme Court of the United States as reported in Citizens National Bank v. Davisson, 229 U.S. 212, 33 S.Ct. 625, 629, 57 L.Ed. 1153. We find nothing in the opinion in the case as reported in either court that contravenes the result we here announce. Indeed, there is language in the report of the case in each court supporting our conclusions. For instance, the following from 2 Page on Contracts 585 which the Territorial Supreme Court quoted approvingly, to wit:

"The depository of an escrow is regarded as an agent of both obligor

and obligee, and he can neither return the deed or other instrument to the former without the latter's consent, nor save upon the fulfilment of the agreed conditions deliver it to the latter without the former's consent."

Furthermore, the following language from the opinion of the Supreme Court of the United States in the case makes crystal clear a pointed difference between the two cases, to wit:

"The indorsement upon the envelope was a mere memorandum, not containing any clear expression respecting the agreement of the parties, and evidently unintelligible unless read in connection with the contract of sale. Quite as manifestly the deposit had no reason for existence except in aid of that contract, and as a protection to both contracting parties.

"The fact that no officer of the bank read this contract or knew of its terms is of no avail to the bank. By the very circumstances of the deposit it was put upon notice that it was assuming a duty that could not be fully understood or fairly performed without a knowledge of the contents of the contract; * * *."

Thus, whereas in the Davisson case there was no clear expression concerning the agreement of the parties but merely a memorandum by an employee of the bank upon the envelope in which the real estate contract was enclosed, here there was a simple and lucid statement of the terms and conditions of the escrow embodied in the escrow letter signed by the plaintiffs and accepted by the defendant by a written endorsement at the bottom thereof. The following authorities support our conclusions. 19 Am.Jur. 435, § 17 under "Escrow" and Law v. Title Guaranty and Title Company, 91 Cal.App. 621, 628, 267 P. 565. The author of the text cited in American Jurisprudence states:

"Where a person assumes to and does act as the depositary in escrow, he is absolutely bound by the terms and conditions of the deposit and charged with a strict execution of the duties voluntarily assumed. It is not in his province to interpret or construe a contract where he has a duty to perform; he must be guided in his duty by what the contract says."

In Law v. Title Guaranty and Title Company, supra [91 Cal.App. 621, 267 P. 568], the court stated:

"Section 1057, Civil Code, defines an escrow as follows:

"'A grant may be deposited by the grantor with a third person, to be delivered on performance of a condition, and, on delivery by the depositary, it

will take effect. While in possession of the third person, and subject to conditions, it is called an escrow.'

"It will be observed that it is only while the instrument is subject to the conditions imposed that the deposit will be deemed to be an escrow. When the conditions upon which the deposit of the instrument have been fully performed, the relationship of the interested parties automatically changes and the depositary is then deemed to hold the instrument as a trustee for the party entitled thereto."

A careful review of the record satisfies us that the trial court properly directed a verdict in favor of the defendant. A verdict for the plaintiffs under the evidence would properly have invoked an order setting it aside. Some questions are argued and not specifically decided but they are either resolved or rendered immaterial by the conclusions announced. Accordingly, the judgment will be affirmed with costs of appeal to be taxed against the plaintiffs (appellants).

It is so ordered.

McGHEE and COMPTON, JJ., concur.

LUJAN, C. J., not participating.

COORS, J., having tried the case below, did not participate.